**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHRISTOPHER OSTERBAUER, derivatively on behalf of Nominal Defendant, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. |
| ANTHONY SANTILLI, RICHARD KAUFMAN, ALBERT W. MANDIA, LEONARD BECKER, MICHAEL DE LUCA, and HAROLD E. SUSSMAN, | ) ) ) ) ) | Jury Trial Demanded |
| Defendants, | ) ) | |
| and | ) ) | |
| AMERICAN BUSINESS FINANCIAL SERVICES, INC., | ) ) ) | |
| Nominal Defendant. | ) ) | |

## SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, Christopher Osterbauer ("Osterbauer" or Plaintiff") derivatively on behalf of Nominal Defendant American Business Financial Services, Inc. ("ABFI" or the "Company") for his complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation of counsel, which included, among other things, a review of ABFI's public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and concerning ABFI and information readily available on the internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right and for the benefit of Nominal Defendant ABFI against Defendants for their breaches of fiduciary duties, abuse of control, gross mismanagement, and other violations of law during the Relevant Period, January 27, 2000 – June 25, 2003.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1) in that Plaintiff and Defendants are citizens of difference states and the amount in controversy exceeds $75,000.

3.     This action is not a collusive one designed to confer jurisdiction on a court which it would not otherwise have.

4.     Venue is proper in this District pursuant to 28 U.S.C. §139(a)(1) because ABFI's principal place of business is located within this District and many of the acts complained of, including the dissemination of materially false and misleading statements and reports prepared by or with the participation, acquiescence, encouragement, cooperation, or assistance of Defendants, occurred, at least in part, within this District.

## PARTIES

5.     Plaintiff, Osterbauer, is a resident and citizen of the state of Maine and is currently, and has been at all relevant times a shareholder of record of ABFI, as set forth in the attached verification.

6.      Nominal Defendant ABFI is a corporation organized and existing under the laws of the state of Delaware with its principal place of business located at 100 Penn Square East, Philadelphia, PA  19107.

7.      Defendant Anthony J. Santilli ("Santilli") was, at all relevant times, the Company's Chairman of the Board of Directors, Chief Executive Officer, President and Chief Operating Officer.  Santilli is currently a member of ABFI's Board of Directors, and has been a Board member since 1993.

8.      Defendant Richard Kaufman ("Kaufman") was, at all relevant times, a Director of ABFI.  Kaufman is not currently a member of the Board of Directors.

9.      Defendant Albert W. Mandia ("Mandia") was, at all relevant times, the Company's Chief Financial Officer.

10.     Defendant Leonard Becker ("Becker") was, at all relevant times, a Director of ABFI and a member of the Board's Audit, Executive and Finance Committees.  Becker is currently a member of ABFI's Board of Directors, and has been a Board member since 1993.

11.     Defendant Michael DeLuca ("DeLuca") was, at all relevant times, a Director of ABFI and a member of the Board's Audit and Finance Committees.  DeLuca is currently a member of ABFI's Board of Directors, and has been a Board member since 1993.

12.     Defendant Harold E. Sussman ("Sussman") was, at all relevant times, a Director of ABFI and a member of the Board's Audit, Executive and Finance Committees. Sussman is currently a member of ABFI's Board of Directors, and has been a Board member since 1993.  He was a member of the Audit Committee until March 20, 2003.

13.    Defendants Santilli, Kaufman, Mandia, Becker, DeLuca and Sussman are collectively referred to herein as the "Defendants."  Each of the Defendants, as senior executive officers and/or directors of ABFI, were privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

14.    Each of the Defendants are liable as a direct participant with respect to the fraudulent schemes and courses of conduct alleged herein and/or for allowing through gross recklessness such wrongful conduct to occur.  In addition, by reason of their status as senior executive officers and directors, the Defendants had the power and influence to cause ABFI to engage in unlawful conduct and/or to prevent same.

15.    The Defendants, because of their positions with ABFI, had the opportunity to commit and/or the responsibility to prevent the fraudulent acts alleged herein, and were responsible for the accuracy of public reports of ABFI.

16.    As further alleged herein ABFI's current Board of Directors is unable to make an impartial determination as to whether to institute legal proceedings to redress the wrongful conduct alleged herein because there is a substantial likelihood that a majority of its members would be found liable for non-exculpated breaches of their fiduciary duties to the Company and shareholders by participating or acquiescing in the wrongdoing alleged herein and/or completely failing to perform their oversight duties to the Company, failing to oversee the Company's compliance with legally mandated

accounting and disclosure standards and systemic failure to assure that a reasonable information and reporting system existed.  The current Board of Directors is also unable to make an impartial decision as to whether to institute legal proceedings to redress the wrongful conduct alleged herein because the Board is dominated by Defendant Santilli, the founder of the Company and its largest shareholder (40% of its common shares), who personally made many of the material misrepresentations and omissions alleged herein.

17.    During the Relevant Period, the Defendants, as senior executive officers and/or Directors of ABFI were privy to confidential and proprietary information concerning ABFI, its operations, finances, financial condition, and present and future business prospects.  The Defendants also had access to material adverse non-public information concerning ABFI.  Because of their possession of such information, the Defendants knew or consciously disregarded the fact that the material misrepresentations and omissions specified herein were being made to, had not been disclosed to, and were being concealed from, the investing public.

18.    The Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases, and presentations to securities analysts and through them to the shareholders and investing public.  The Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

19.    As senior executive officers and/or directors of a publicly-traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and

which was traded on the NASDAQ and governed by the federal securities laws, the Defendants had a duty to disseminate promptly accurate and truthful information with respect to ABFI's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of ABFI's common stock would be based upon truthful and accurate information.

20.     As members of the Board of Directors of ABFI, the Director Defendants were directly responsible for authorizing or permitting the authorization of, or failing to monitor, the practices which resulted in the violations of the federal securities laws as alleged herein.

21.     The Director Defendants which constitute a majority of the Company's current Board of Directors have a substantial likelihood of being held personally liable for the misconduct complained of herein.

**SUBSTANTIVE ALLEGATIONS**

**Background**

22.     ABFI is a diversified financial services organization operating predominately in the eastern and central regions of the United States.   ABFI is the parent holding company for American Business Credit, Inc. and its primary subsidiaries, Home American Credit, Inc. (d/b/a Upland Mortgage), American Business Mortgage Services, Inc. and Tiger Relocation Company.

23.     Its loans primarily consist of fixed-interest-rate loans secured by first or second mortgages on one to four family residences.   The Company's customers are primarily

credit-impaired borrowers who are generally unable to obtain financing from banks or savings and loan associations.

24.     On January 27, 2000, ABFI announced record results for the Company's second fiscal quarter and six months ended December 31, 1999.  ABFI reported that total revenues for the second quarter of fiscal year 2000 were a record $30.6 million, an increase of 58% over the comparable prior year period.  Fee income was $3.1 million, an increase of 32% over the $2.3 million of fee income for the comparable prior year period.  Net income for the quarter was $3.8 million, an increase of 7% over the three months ended December 31, 1998.  Fully diluted earnings per share for the quarter were $1.08, an increase of 17% over the comparable prior year period.

25.     Commenting on these results, Defendant Santilli stated:

> Our Company's growth in originations and profitability reflect the brand awareness and marketing muscle of both our small business lending operation and retail mortgage banking business.  At the same time, ABFI has been well-served by our focus on near prime borrowers, our retail origination strategy, adherence to centralized underwriting policies and controls, and our distribution strategy.  We clearly believe this traditional banking origination differentiates us from others in the sector, including Internet mortgage originators who have been challenged by the difficulties of the home mortgage industry.

26.     On February 14, 2000, the Company filed its quarterly report Form 10-Q with the SEC.  This 10-Q was signed by defendant Mandia and reaffirmed the Company's previously announced financial results.

27.     On April 3, 2000, the Company issued a press release with the headline "American Business Financial Closes its Largest Securitization Ever at $235 Million; Reports Record-Breaking Quarterly and March Production."  Therein, ABFI reported that its third fiscal quarter, ending March 31, 2000, was its best quarter of production

ever, with total loan originations exceeding $275 million.  Of significance was the month

of March, during which the Company reported over $100 million in originations --a

record-breaking month for ABFI.  Additionally, ABFI stated on March 30, 2000, it closed

a $235 million mortgage loan securitization through its three subsidiaries, American

Business Credit, Inc., Upland Mortgage, and New Jersey Mortgage and Investment

Company. The Company's ninth consecutive quarterly securitization, and ABFI's largest

ever, represented loans originated during the Company's third fiscal quarter.

28.     Commenting on this, Defendant Santilli stated:

> I am very proud of the way this organization has focused its energies on answering the needs of our target markets. This achievement demonstrates that, even during a period of interest rate tightening by the Federal Reserve, our needs-based, retail origination strategy is not only working, but thriving. Our business lending and consumer mortgage divisions deserve credit for an outstanding month and quarter.

> * * *

> The fact that we have been able to maintain our quarterly pace of securitizations for nine consecutive quarters is testament to our focus on credit quality, the application of uniform underwriting standards, and our retail origination strategy. We adopted these practices long before they became fashionable, and they have enabled us to sustain our profitability despite a fluctuating business and interest rate environment

29.     On April 25, 2000, ABFI announced its financial results for the third quarter

ended March 31, 2000. The Company reported earnings per share of $1.12, up 22%

from $0.92 a year earlier, and a 12% increase in net income from $3.5 million to $3.9

million. The Company also had $295 million of loan originations for the third quarter, up

40% from the same period of the previous year, and a 40 basis point decline in

delinquencies to 3.18% from the previous quarter. As of March 31, 2000, the

Company's managed portfolio was $1.7 billion, up 68% from the same period a year earlier.

30.     Focusing on this quarter's record originations, Defendant Santilli stated: "We continue to build a valuable portfolio of serviced loans. The income we earn from our serviced portfolio is significant to the quality of our earnings both now and in the future." He added that ABFI's ability to originate, fund and service high quality loans enabled the Company to profit from an increasing stream of fees, accretion, and servicing income. "Our growing servicing portfolio enhances the long-term value of our franchise, reduces earnings risk, and provides a growing source of cash to fund future growth."

31.     Defendant Santilli further added:

> **The average coupon on ABFI's pool of business and consumer loans was almost 12% for loans originated during the quarter. This was higher than the industry average for the period of 10.4%. . . . Because of our unique mix of business loans and home equity loans, we were able to experience a better weighted average coupon, which sets us apart from our competitors.  ABFI's delinquency rate of 3.18%, which is down 40 basis points from the second fiscal quarter ended December 1999, remains one of the lowest in the industry. In addition, ABFI's "over 30 day delinquency rate" of 5.3% on a trailing 12-month basis remains well below the industry average. The Company's REO (foreclosed properties and deeds acquired in lieu of foreclosure) was 0.85% of the total portfolio, down from 0.90% at the end of December 1999.**
>
> **…We attribute our asset quality to a number of factors including retail origination and centralized underwriting. Our emphasis on prompt and proactive collections is equally important.  The absolute dollar increase in delinquencies between the second and third quarter was $430 thousand, while our overall managed portfolio grew by more than $200 million.**

(Emphasis added.)

32.     On May 12, 2000, the Company filed its quarterly report Form 10-Q with the SEC. The Company's Form 10-Q was signed by Defendant Mandia and reaffirmed the Company's previously announced financial results.

33.     On June 29 2000, ABFI issued a press release with the headline: "American Business Financial Services, Inc. Closes Its Largest Securitization Ever At $300 Million." Therein, the Company reported that it has closed a $300 million mortgage loan securitization through its three subsidiaries, American Business Credit, Inc., Upland Mortgage, and New Jersey Mortgage and Investment Corp. This was ABFI's tenth consecutive quarterly securitization, and ABFI's largest ever, representing loans originated during the Company's fourth fiscal quarter. The securitization also put ABFI past the $2 billion mark in securitized home equity loans.

34.     Commenting on this, Defendant Santilli stated: "I am very proud that we have been able to maintain our pace of securitizations for ten straight quarters, and now have more than $2 billion in securitized loans."  He further added, "These accomplishments demonstrate our continued focus on credit quality, the application of uniform underwriting standards, and our retail origination strategy. These practices are critical to our ongoing success, and central to our strategy of managed growth."

35.     On September 29, 2000, ABFI issued a press release with the headline: "American Business Financial Services Closes 11th Consecutive Quarterly Securitization; Announces Improved Overcollateralization Requirements." Therein, the Company reported that it had closed a $150 million mortgage loan securitization through its three subsidiaries, American Business Credit, Inc., Upland Mortgage and New Jersey Mortgage and Investment Corp. The Company's 11th consecutive quarterly

securitization represented approximately one-half of the loans originated during the Company's first fiscal quarter 2001. In addition, ABFI believed that this securitization was more economically beneficial to the Company than the prior quarter's securitization, based on improved credit enhancement levels (overcollateralization) on this pool of loans. This improvement represented an estimated 20% reduction in required overcollateralization from the prior quarter's securitization.

36.    On October 10, 2000, ABFI announced its financial results for the fourth quarter and fiscal year. ABFI reported that total revenues increased 51% to a record $130.6 million in fiscal year 2000, up from $86.4 million during the prior year. Loan originations increased 30% to record levels, with the Company reporting $1.1 billion in fiscal year 2000. As of June 30, 2000, the Company's managed portfolio was $1.9 billion, up 63% from fiscal year 1999. For the fiscal fourth quarter of 2000, the Company reported record revenues of $38.1 million, a 51% increase over $25.2 million from the prior year period. The Company also reported $316 million of loan originations for the fourth quarter, up 30% from the same period of the previous year. Additionally, the Company reported net income of $6.4 million, or $1.83 per diluted share, for the fiscal year ended June 30, 2000, as compared to $172 in fiscal year 1999. In the fiscal fourth quarter, the Company reported a net loss of $5.0 million or $1.40 per diluted share compared to net income of $3.7 million or$0.98 in the prior year period.

37.    With respect to loan delinquencies, ABFI stated that its loan delinquencies were among the lowest in the industry.  The Company reported a delinquency rate of 2.9% at June 30, 2000. Commenting on this, Defendant Mandia stated, "Our well-below industry average delinquency rate of 2.91% continues to distinguish our Company. Down 27

basis points from the rate at March 31, 2000, our delinquency rate remains one of the lowest in the industry."

38.     Also on October 10, 2000, the Company filed its annual report Form 10-K with the SEC. The Company's Form 10-K was signed by each of the Defendants and reaffirmed the Company's previously announced financial results.

39.     On November 9, 2000, ABFI announced its financial results for first quarter of 2001, the period ended September 30, 2000.  The Company reported earnings of $0.40 per diluted share, and net income of $1.4 million. Additionally, ABFI achieved record revenues of $38.4 million in the first quarter of 2001, an increase of 38% over $27.8 million in the first quarter of fiscal year 2000.  ABFI stated that because of the many benefits realized by retaining $45 million of its first quarter loan production on its balance sheet, including the ability to increase future interest income, ABFI expects to deploy this strategy from time to time in the future. Moreover, ABFI stated, "Delinquency Rate Among Industry's Lowest: ABFI's delinquency rate of 2.88% remains one of the lowest in the industry, down for the third consecutive quarter, 40 basis points from the first quarter ended September 30, 1999."

40.     On November 14, 2000, the Company filed its quarterly report Form 10-Q with the SEC. The Company's Form 10-Q was signed by Defendant Mandia and reaffirmed the Company's previously announced financial results.

41.     On January 25, 2001, the Company announced "record" financial results for the second quarter of 2001, the period ended December 31, 2000. ABFI reported net income of $2.4 million, or $0.72 per diluted share, for the second quarter of fiscal year 2001, and net income for the first six months ended December 31, 2000 of $3.8 million,

or $1.12 per diluted share. The Company reported record revenues of $44.5 million in the second quarter of fiscal year 2001, an increase of 45% over $30.6 million in fiscal year 2000. Revenues for the first six months of fiscal year 2001 reached a record $82.9 million, a 42% increase over the prior year period. The Company reported higher gains on sales of loans over the year ago period, attributable primarily to a more favorable interest rate environment and higher securitization volume. With respect to delinquency rates, the Company stated:

> **Delinquency Rates Among Industry's Lowest: ABFI's delinquency rate of 3.33% remains one of the lowest In the industry. Santilli said, "Last year at this time, the Company reported a delinquency rate of 3.58% on a $1.5 billion portfolio. This year, we have a delinquency rate of 3.33% on a $2.3 billion portfolio. We are extremely proud of this, and we believe it is a major contributor to increasing shareholder value in this Company." Santilli added that quarter to quarter, the delinquency rate increased 45 basis points, which is a seasonal trend for the Company during the December holiday season.**

(Emphasis added.)

42.     On February 13, 2001, the Company filed its quarterly report Form 10-Q with the SEC. The Company's Form 10-Q was signed by Defendant Mandia and reaffirmed the Company's previously announced financial results.

43.     On March 26, 2001, the Company issued a press release with the headline: "American Business Financial Services, Inc. Closes 13th Consecutive Quarterly Securitization." Therein, ABFI reported that it had closed a $275 million mortgage loan securitization through its three subsidiaries, American Business Credit, Inc., Upland Mortgage, and American Business Mortgage Services, Inc. This securitization also included a lower overcollateralization requirement than prior securitizations. ABFI believed that the lower overcollateralization levels applicable in this securitization would

result in the realization of cash flows more quickly by ABFI than would be realized in the prior quarter's securitization, assuming the securitized loans performed as projected.

44.     On May 1, 2001, the Company announced its financial results for the Company's third fiscal quarter ended March 31, 2001.  ABFI achieved record revenues of $47.3 million in the third quarter of fiscal year 2001, an increase of 38% over the $34.1 million in revenues for the same period of fiscal year 2000. Revenues for the first nine months of fiscal year 2001 reached a record $130.2 million, a 41% increase over the prior year period. The Company reported higher gains on sale of loans over the year ago period, primarily attributable to a more favorable interest rate environment and better execution of its securitizations. ABFI reported net income of $2.9 million, or $0.89 per diluted share, for the third quarter of fiscal year 2001, and net income for the nine months ended March 31, 2001, of $6.6 million, or $2.01 per diluted share. With respect to delinquency rates, the Company stated:

> Delinquency Rate Remain Among Our Industry's Lowest: Once again, ABFI's delinquency rate of 3.53% remains one of the lowest in the nonprime industry. **"We have maintained for years that success in our business rests not simply with originations, but equally with the ability to ensure that our loans are repaid in a timely fashion," Ruben asserted. "The resources we have deployed in this area are evident in the delinquency rate we achieved in this quarter."**. . as the ABFI portfolio matures, some increase in the overall delinquency rate will be inevitable. "Last year at this time, we reported a delinquency rate of 3.18% on a $1.7 billion managed portfolio. In today's economic environment, to have a 35 basis point increase on a maturing portfolio that has grown 44% in one year is something we are extremely proud of.

(Emphasis added.)

45.     Commenting on the Company's "record" results, Defendant Santilli stated, "We are very pleased with the sequential growth in revenues, earnings, and earnings per

share which we have been able to achieve during the current quarter. On a sequential basis, our net income increased by 20%."

46.    On May 14, 2001, the Company filed its quarterly report Form 10-Q with the SEC. The Company's Form 10-Q was signed by Defendant Mandia and reaffirmed the Company's previously announced financial results.

47.    On June 28, 2001, ABFI announced that it closed its largest securitization ever at $355 million; putting the Company past the $3 billion mark in securitized home equity loans. Commenting on this, Defendant Santilli stated: "We have been able to maintain our pace of quarterly securitizations for fourteen straight quarters. Our approach is critical to our ongoing success, and central to our strategy of managed growth. We are particularly pleased with the demand shown for the certificates in this securitization, and the quality of purchasers that we were able to attract."

48.    On September 25, 2001, ABFI announced its financial results for the fourth quarter and year-ended June 30, 2001. The Company reported revenues of $53.1 million, a 39% increase over the $38.1 million during the prior year period. Net income for the quarter was $1.5 million, versus a loss of $5.0 million for the same period in fiscal year 2000, while diluted earnings per share were $0.51, versus a loss of $1.44 per share during the prior year period. With respect to delinquencies, ABFI stated:

> Delinquency Rates remain among our industry's lowest: Once again, ABFI's delinquency rate (includes loans delinquent 31 days or more, excluding REO) of 4.13% at June 30, 2001, remains one of the lowest in the nonprime industry. ABFI's real estate owned (REO) totaled $28.4 million at June 30, 2001, as compared to $13.1 million at June 30, 2000. Although the delinquency rate is higher than 2000's figure, the Company notes that as its portfolio matures, some increase in the overall delinquency rate will be inevitable. "Also, given today's declining economy, -to have a delinquency rate that consistently outperforms our industry, while we have increased our managed portfolio by 350% in one year is

something that we are very proud of," Santilli said. **We know that today's national economic realities will make this trend higher, but we remain vigilant in our proactive focus on collections**"

(Emphasis added.)

49.   Commenting on these results, defendant Santilli stated: "The growth of ABFI is a testament to our ability to stay the course. Our success is clear evidence of the value we bring to consumers and small businesses in communities we serve across America. We firmly believe our accomplishments come from combining the demand for our products with significant investments in training, new technology and the ongoing development of one of the most sophisticated portfolio management tools in the industry."

50.   On September 28, 2001, the Company filed its annual report Form 10-K with the SEC. The Company's Form 10-K was signed by each of the Defendants and reaffirmed the Company's previously announced financial results.

51.   On October 30, 2001, the Company announced its financial results for the Company's fiscal first quarter, ended September 30, 2001.  ABFI reported net income for the fiscal first quarter of $1.36 million, compared to $1.35 million for the same period the previous year. Net income per diluted share was $0.44, 22.2% higher than the $0.36 per diluted share in the prior year period, which was attributed to a reduction in outstanding shares. ABFI achieved total revenues of $50.7 million in the fiscal first quarter of 2002, a 32% increase over the 538.4 million in revenues for the same period last year. Loan originations rose to $319.0 million during the fiscal first quarter, versus $310.9 million in the same period last year. With respect to delinquencies, ABFI

reported that delinquencies (including loans delinquent 31 days or more, and excluding REO) were 5.42% at September 30, 2001, compared to 2.88% at September 30, 2000.

52.     On November 13, 2001, the Company filed its quarterly report Form 10-Q with the SEC. The Company's Form 10-Q was signed by Defendant Mandia and reaffirmed the Company's previously announced financial results.

53.     On January 23, 2002, the Company announced its financial results for the fiscal second quarter ended December 31, 2001. ABFI reported net income for the fiscal second quarter of $2.5 million, compared to $2.4 million for the same period the previous year. Net income per diluted share was $0.87, 34% higher than the $0.65 per diluted share in the prior year period, which was attributed to a reduction in outstanding shares resulting from stock repurchases. ABFI achieved total revenues of $60.0 million in the fiscal second quarter of 2002, a 35% increase over the $44.5 million in revenues for the same period the previous year. This represented a quarterly revenue record for ABFI. During the quarter, ABFI recorded a $4.5 million adjustment to the value of the Company's interest-only strips to account for the impact of increased loan prepayments being experienced throughout the mortgage industry because of lower interest rates. The Company also reported record quarterly loan originations of $358.8 million, a 24% increase over the $289.4 million in originations during the same period of fiscal year 2001.

54.     Commenting on theses results, Defendant Santilli stated:

> **Our results are very gratifying given the fact that the fiscal second quarter was marked by an overall downturn in the economy. Our record revenues were a result of strong loan production coupled with favorable interest rate spreads. We believe the fact that we were able to maintain our earnings momentum during a period of declining interest rates and economic conditions, including**

**increased prepayment activity, demonstrates our commitment to doing business the right way every day, from the origination process through to the careful servicing of our portfolio.**

**At December 31, 2001 the managed portfolio, which includes primarily loans that the Company services for others, was $2.8 billion, compared to $23 billion at December 31, 2000. "Our revenue growth, in part, reflects the growth and performance of our managed portfolio," Santilli said. "Every loan we originate, securitize and sell builds our managed portfolio, and, assuming it performs as we expect, the Company can realize revenue and cash streams, through such things as servicing fee income and interest accretion on our interest-only strips.**

**We are extremely proud of the way we carefully manage our portfolio," said Santilli. "This is borne out by the fact that our delinquencies (including loans delinquent 31 days or more, but excluding REO) were 6.08% at December 31, 2001.  Although this is higher than our 5.42% delinquency rate we reported last quarter, it is well below the overall nonprime industry rate, which according to the most recent available statistics increased to 19.80% at September 30, 2001 from 16.04% at September 30, 2000. Certainly, the nation's economic conditions have contributed to this increase, but it is important to note that we as a Company expect delinquencies and REO to rise as the managed portfolio grows and matures and we have prepared appropriately for it. The fact that our delinquency rate is significantly below the industry average demonstrates our belief that the collections function is as important to us as our origination function, and we work hard to make sure that the loans we make are paid back.**

(Emphasis added.)

55.     On February 14, 2002, the Company filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by Defendant Mandia and reaffirmed the Company's previously announced financial results.

56.     On April 24, 2002, the Company announced its financial results for the third quarter, the period ended March 31, 2002. ABFI achieved total revenues of $65.4 million in the fiscal third quarter of 2002, a 38% increase over the $47.3 million in revenues for the same period the previous year. This represented a quarterly revenue

record for ABFI. Revenues for the first nine months of fiscal year 2002 reached a record $176.1 million, a 35.3% increase over the prior year period. The Company also reported quarterly loan originations of $328.8 million, a 20% increase over the $273.5 million in originations during the same period of fiscal year 2001. Originations for the first nine months of fiscal year 2002 totaled a record $1.0 billion, a 15.2% increase over the prior year period. Net income for the fiscal third quarter was $1.8 million ($0.60 per diluted share), compared to $2.9 million ($0.82 per diluted share) for the same period last year. With respect to its delinquency numbers, ABFI stated **its 5.91% delinquency rate at March 31, 2002 was significantly less than the overall nonprime industry rate, which according to the most recent industry statistics was 17.24% at December 31, 2001. "We believe the fact that our delinquency rate is well below the non prime industry average is an extremely important element to our overall success," Defendant Santilli said. "Our historical record supports our core belief that collections are every bit as important as originations to deliver success in this business. We believe it's really what sets us apart."** (Emphasis added.)

57.    On May 15, 2002, the Company filed its quarterly report Form 10-Q with the SEC.  The Company's Form 10-Q was signed by Defendant Mandia and reaffirmed the Company's previously announced financial results.

58.    On August 22, 2002, the Company announced its financial results for the fourth quarter and year-ended June 30, 2003. ABFI reported record revenues of $71 .8 million and $247.9 million for the fourth quarter and fiscal year, respectively. Net income for the fourth quarter was $2.3 million ($0.83 per diluted share), compared to $1.5 million ($0.46 per diluted share) in the same period last fiscal year.  For the 2002 fiscal year,

net income was $7.9 million, compared to $8.1 million in the last fiscal year. Net income per diluted share for the year was $2.74, up from $2.29 per diluted share for fiscal year 2001, due to a reduction in outstanding shares resulting from stock repurchases. ABFI also reported that it achieved a delinquency rate of 5.57% at June 30, 2002 (including loans delinquent 31 days or more, and excluding REO), compared to 4.13% at June 30, 2001; which continued to outperform the non prime industry, which had an average 17.24% delinquency rate at December 31, 2001. The Company's REO totaled $34.0 million at June 30, 2002, 1.11% of the total managed portfolio, as compared to $28.4 million, or 1.10%, at June 30, 2001.

59.     On September 20, 2002, the Company filed its annual report Form 10-K with the SEC. The Company's Form 10-K was signed by each of the Defendants and reaffirmed the Company's previously announced financial results.

60.     On October 31, 2002, the Company announced its financial results for first quarter ended September 30, 2002. ABFI reported that revenues for the three months ended September 30, 2002 were a record $74.5 million versus revenues of $50.7 million for the previous comparable period, an increase of 47%. Net income for the first quarter was $1.8 million ($0.61 per diluted share), compared to $1.4 million ($0.40 per diluted share) in the same period the previous fiscal year. With respect to delinquency rates, ABFI stated that its delinquency rate of 6.56% at September 30, 2002 (including loans delinquent 31 days or more, and excluding REO), compared to 5.57% at June 30, 2002 and 5.42% at September 30, 2001, continued to outperform the sub prime industry, which had an average 19.83% delinquency rate at March 31, 2002.

61.     Defendant Santilli added that **the delinquency rate of 6.56% is not unexpected**. (Emphasis added.) "We have often commented that we expect our delinquency rate to rise as our managed portfolio grows and matures. Additionally, the country's general economic conditions have contributed to this increase. However, we are pleased that at current levels, our managed portfolio is performing significantly better than industry averages."

62.     On November 13, 2002, the Company filed its quarterly report Form 10-Q with the SEC. The Company's Form 10-Q was signed by Defendant Mandia and reaffirmed the Company's previously announced financial results.

63.     On January 30, 2003, the Company announced its financial results for the second quarter of fiscal year 2003, ended December 31, 2002. ABFI reported record revenues of $74.6 million during the second quarter, an increase of 24.3% over revenues of $60.0 million for the prior year period. Net income for the quarter was $2.1 million ($0.69 per diluted share), compared to $2.5 million ($0.79 per diluted share) in the prior year period. With respect to delinquency levels, ABFI stated that its delinquency rate of 6.62% at December 31, 2002 (including loans delinquent 31 days or more, and excluding REO), compared to 6.56% at September 30, 2002 and 6.08% at December 31,2001, continued to outperform the sub prime industry, which had an average 19.03% delinquency rate at December 31, 2002. ABFI further stated that it closed a $380.0 million public Senior/Subordinated mortgage loan securitization, its third such securitization, and its 20th consecutive quarterly securitization.

64.     Commenting on these results, Defendant Santilli stated, "[I] continue to be extremely proud of the way we manage the portfolio."  Defendant Santilli continued: "To

have a delinquency rate that rose by only 6 basis points (.06%) from the last fiscal quarter, while growing our managed portfolio by $100 million during the quarter, demonstrates our belief that our collections function is as critical to our success as our origination function, and we work extremely hard at both."

65.    On February 14, 2003, the Company flied its quarterly report Form 10-Q with the SEC. The Company's Form 10-Q was signed by Defendant Mandia and reaffirmed the Company's previously announced financial results.

66.    On May 1, 2003, ABFI announced results for the third quarter of fiscal year 2003, ended March 31, 2003. The Company reported record originations of $403.7 million during the third quarter, an increase of 22.8% over originations of $328.8 million for the prior year period. Revenues for the three months ended March 31, 2003 were $71.8 million versus $65.4 million for the comparable period in fiscal year 2002. Net income for the quarter was $0.2 million ($0.06 per diluted share), compared to $1.8 million ($0 per diluted share) in the comparable period a year ago. The Company further stated:

> **Delinquency rate for the managed portfolio of 6.33% at March 31, 2003 (includes loans delinquent 31 days or more, and excludes REO), compared to 6.62% at December 31, 2002, and 6.56% at September 30, 2002, continued to outperform the sub prime industry, which had an average 19.03% delinquency rate at December 31, 2002.**

> **Santilli noted, "To have a delinquency rate that decreased 29 basis points from the last fiscal quarter, while the portfolio we manage grew by $142.3 million during the same time period, and while conducting business in uncertain economic times, demonstrates our belief that our collections function is ultimately crucial to our ongoing success. We are extremely proud of the way we manage the portfolio we service for others**."

(Emphasis added.)

67.    On May 15, 2003, the Company filed its quarterly report Form 10-Q with the SEC.  The Company's Form 10-Q was signed by Defendant Mandia and reaffirmed the Company's previously announced financial results.

68.    The statements referenced above failed to disclose the following material adverse facts which were known to Defendants or recklessly disregarded by them: (1) that the Company used a deception to take homes from delinquent borrowers in order keep its delinquency rate low; (2) that the deception allowed the Company to skip the normal foreclosure process more frequently; (3) that the deception helped the Company to reduce its delinquency rate in its $3.6 billion loan portfolio; (4) as result of reducing its delinquency rate in its $3.6 billion loan portfolio, the Company was able to securitize more loans; and (5) the Company was thus able to collect interest income from its securitized loans and inflate its financial results.

**The Truth Begins To Emerge**

69.    On June 13, 2003, the Company filed a current report Form 8-K with the SEC. Therein, ABFI disclosed that it had received a civil subpoena, dated May 14, 2003, from the Civil Division of the United States Attorney for the Eastern District of Pennsylvania ("Department of Justice") requesting that ABFI provide (among other items) documents and information with respect to ABFI and its lending and/or primary subsidiaries for the period from May 1, 2000 to May 1, 2003, relating to: (1) all loan files with respect to mortgage loan transactions in which the Company entered into a forbearance agreement with a borrower rather than pursue foreclosure or other contract remedies in connection with the borrowers' delinquent loan; (2) the servicing, processing, foreclosing, and handling of delinquent loans, non-performing loans, and loans in

default, the carrying, processing and sale of real estate owned, and forbearance agreements; and (3) agreements to sell or otherwise transfer mortgage loans (including but not limited to, any pooling or securitization agreements) or to obtain funds to finance the underwriting, origination or provision of mortgage loans, any transaction in which mortgage loans were sold or transferred, any instance in which the Company was not to service or not to act as custodian for a mortgage loan, representations and warranties made in connection with mortgage loans, secondary market loan sale schedules, and credit loss, delinquency, default, and foreclosure rates of mortgage loans.

70.    The market reacted swiftly to the news, with shares of ABFI falling 20 percent or $2.13 per share to close at $8.27 per share on June 13, 2003 on extremely heavy trading volume.

71.     On June 26, 2003, ABFI filed a current report Form 8-K with the SEC.  Therein, the Company stated:

> American Business Financial Services, Inc. ("we") currently anticipates incurring a loss for the quarter and year ended June 30, 2003 due to our inability to complete our typical publicly underwritten quarterly securitization of loans during the last quarter of our fiscal year. The exact amount of the loss for the year ended June 30, 2003 cannot be determined at this time but such loss is expected to be in the range of $20 to $30 million. The primary factor in determining the amount of the loss is the amount of the valuation adjustment to our securitization assets. To the extent necessary, we intend to request that our lenders grant waivers of any covenants that we may not be in compliance with as a result of this loss.
>
> We are currently implementing other options for the sale of our loans, including whole loan sales and considering privately placed securitization transactions. In this regard, we entered into an agreement to sell up to $700 million in whole loans on a servicing-released basis, subject to certain conditions, including satisfactory completion of due diligence on each loan sale transaction. From July 1, 2003 to the date of this report, we have completed the sale of approximately $227 million of that total. We are also negotiating agreements with other lenders to sell loans on a

whole loan basis. These transactions represent our move toward less reliance on quarterly publicly underwritten securitizations, in favor of whole loan sales for cash which will allow us to streamline operations, offer a broader product line and capture strategic efficiencies. These changes currently require a smaller employee base and as a result, we reduced our work force by 153 positions. We will continue to consider securitizations as opportunities arise. A previous $300 million loan purchase facility between us and UBS Principal Financial, LLC expired pursuant to its terms, and UBS has no further obligation to purchase loans from us.

Unlike securitizations, whole loan sales are typically structured as a sale with servicing released and we do not retain securitization assets such as interest-only strips. As a result, we will not, with respect to the whole loans sold, receive future servicing income or cash flow from interest-only strips generated in the securitization process. This will not affect our existing mortgage servicing rights or interest only strips. Although we realize significantly higher gains from securitizations than from whole loan sales, the benefit of whole loan sales is that we receive those gains immediately in cash.

We are in the business of making and selling loans, primarily through whole loan sales and securitizations. Prior to 1995, our primary method of selling loans was through whole loan sales and we did not engage in securitizations. From January 1995 through March 31, 2003, our primary method of selling loans was through securitizations. Our method of selling loans at any given time varies according to prevailing market conditions and other factors.

72.     News of this again sent shares of ABFI plummeting. Shares of ABFI fell 12% or $1.00 per share to close at $7.40 per share.

73.     On December 23, 2003, ABFI announced that it had entered into a joint agreement with the Department of Justice in which ABFI agreed to modify its forbearance policy such that deeds in lieu of foreclosure would no longer be required from seriously delinquent customers.  ABFI additionally agreed to contribute $80,000 to Housing and Urban Development approved housing counseling organizations.

74.     Defendants issued false and misleading statements and omitted to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.

75.     ABFI reported its financial results in press releases and in filings made with the SEC. The SEC filings indicated that ABFI's results were presented in conformity with GAAP. The results issued and representations concerning those results were false and misleading when made, as ABFI's financial statements during the Relevant Period were in violation of GAAP and SEC rules.

76.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP.

77.     Due to ABFI's accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

> (a) The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28 ¶10);
>
> (b) The principle that financial reporting should provide information that is useful to present potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶ 34);
>
> (c) The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects

of transactions, events, or circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶ 40);

(d) The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶ 50);

(e) The principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts, No. 1, ¶42);

(f) The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting.  (FASB Statement of Concepts No. 2, ¶¶ 58-59);

(g) The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79) ; and

(h) The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶ 95, 97).

78. Further, the undisclosed adverse information concealed by Defendants is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practices, is expected by investors, shareholders and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

79.    Throughout the Relevant Period, the Defendants disseminated and/or approved the false statements specified above, which they knew were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.   Furthermore, the Director Defendants failed to discharge their responsibilities of oversight of the Company's affairs.  Because of the actions described herein, securities class actions have been filed against the Company which have had the effect of impairing the Company's credibility in the market place and elsewhere and have impaired the Company's ability to secure credit and originate new loans.  The Defendants' malfeasance and/or misfeasance has exposed the Company to millions of dollars in liability to investors in class action lawsuits which have been filed against the Company as well as current investigatory and litigation expenses which will continue into the future.

80.    The Company should not have to bear the enormous financial burdens caused by the actions of the Defendants who breached their fiduciary duties owed to ABFI by issuing false and misleading financial statements for the Company and/or completely failing to discharge their oversight responsibilities.

81.    Also Defendant Kaufman, as detailed below, engaged in massive insider trading during the Relevant Period.

## DEMAND EXCUSED ALLEGATIONS

82.    Plaintiff is an owner of ABFI common stock and was an owner of ABFI common stock during the time period relevant to the Defendants' wrongful course of conduct alleged herein through the present.

83.    ABFI's Board of Directors is currently composed of seven (7) directors – Leonard Becker, Michael DeLuca, Jerome Miller, Warren Palitz, Anthony J. Santilli, Joseph F. Pignotti and Harold E. Sussman.   Santilli, Becker, DeLuca and Sussman have been named as Defendants herein.

84.    Defendant Santilli, as a director, owed a duty to ABFI and its shareholders to be reasonably informed about the business and operations of the Company.   As CEO, COO, President, Chairman of the Board of Directors, and a member of the Executive and Finance Committees of the Board of Directors, Santilli also assumed important managerial responsibilities which required him to be well informed about the day-to-day operations of the Company.    However, Santilli breached these duties by actively participating in, encouraging, sponsoring, and/or approving many of the wrongful acts or omissions complained of herein and/or purposefully or recklessly disregarding these wrongful acts or omissions.   ABFI's Board of Directors is dominated by Santilli, the founder of the Company and with his wife, its largest shareholder, owning directly or beneficially 39.7% of the company's common stock and thereby effectively controlling the direction of the Company, including the composition of the Company's Board of Directors and the retention of its members.   Furthermore, many of Santilli's family members hold executive positions within ABFI and/or its subsidiaries, including his wife Beverly Santilli, who earned $651,000 during the past year, son John Santilli, who earned $290,000 during the past year, daughter, Carole Santilli, who earned $130,000 during the past year, and daughter-in-law Barbara Rosenthal, who earned $140,000 during the past year.

85.     Defendant Becker, as a Director, owed a duty to ABFI and its shareholders to be reasonably informed about the business and operations of the Company.   As a member of the Audit, Executive and Finance Committees, Becker also assumed important managerial responsibilities which required him to be well informed about the day-to-day operations of the Company.  As a member of the Audit Committee, he had a duty to ensure that ABFI's internal accounting procedures and controls and the Company's financial statements complied with GAAP.   However, Becker breached these duties by actively participating in, encouraging, sponsoring, and/or approving many of the wrongful acts or omissions complained of herein and/or purposefully or recklessly disregarding these wrongful acts or omissions.   Becker owns, directly or beneficially, 5.2% of the Company's common stock.

86.     Defendant DeLuca, as a director, owed a duty to ABFI and its shareholders to be reasonably informed about the business and operations of the Company.   As a member of the Audit and Finance Committees, DeLuca also assumed important managerial responsibilities which required him to be well informed about the day-to-day operations of the Company.  As a member of the Audit Committee, he had a duty to ensure that ABFI's internal accounting procedures and controls and the Company's financial statements complied with GAAP.  However, DeLuca breached these duties by actively participating in, encouraging, sponsoring, and/or approving many of the wrongful acts or omissions complained of herein and/or purposefully or recklessly disregarding these wrongful acts or omissions.  DeLuca owns directly or beneficially 9% of the Company's common stock.

87.    Defendant Sussman, as a director, owed a duty to ABFI and its shareholders to be reasonably informed about the business and operations of the Company.    As a member of the Audit Committee, Sussman also assumed important managerial responsibilities which required him to be well informed about the day-to-day operations of the Company, and he had a duty to ensure that ABFI's internal accounting procedures and controls and the Company's financial statements complied with GAAP. However, Sussman breached these duties by actively participating in, encouraging, sponsoring, and/or approving many of the wrongful acts or omissions complained of herein and/or purposefully or recklessly disregarding these wrongful acts or omissions. Sussman owns directly or beneficially 4.8% of the Company's common stock.

88.    Defendant Kaufman, as a director, owed a duty to ABFI and its shareholders to be reasonably informed about the business and operations of the Company.  Kaufman breached these duties by actively participating in, encouraging, sponsoring, and/or approving many of the wrongful acts or omissions complained of herein and/or purposefully or recklessly disregarding these wrongful acts or omissions.  During the time complained of herein, Kaufman engaged in massive insider trading, as detailed below.   In 2001, the Company awarded Kaufman 3,025 shares (including stock dividends) for services performed in connection with a stock repurchase program. Kaufman's daughter is employed by the Company and earned $75,000 in base compensation plus bonuses in the previous year.

89.    Defendant Mandia, as CFO, owed a duty to ABFI and its shareholders to be reasonably informed about the business and operations of the Company.  He also assumed important managerial responsibilities which required him to be well informed

about the day-to-day operations of the Company.  As CFO, he had a duty to ensure that ABFI's internal accounting procedures and controls and the Company's financial statements complied with GAAP.  Instead, Mandia breached these duties by actively participating in, encouraging, sponsoring, and/or approving many of the wrongful acts or omissions complained of herein and/or purposefully or recklessly disregarding these wrongful acts or omissions.  Mandia is a direct participant in the wrongdoing complained of herein because, as CFO, he was directly responsible for approving the Company's financial statements.  Mandia owns 1.9% of the Company's common stock.

90.     Director Pignotti joined the Board of Directors of the Company on March 1, 2004. From 1997-2002 Pignotti served as a consultant to ABFI and assisted the Company in obtaining its lines of credit.

91.     In 2003, ABFI retained the firm of Lanard & Axilbund, Inc. as an agent in a transaction regarding the lease of office space.  Director Sussman was a partner, and is currently Chairman Emeritus of Lanard & Axilbund.  Sussman was a partner with Lanard & Axilbund at the time it was retained by the Company

92.     ABFI, in its 2003 Annual Report, has stated that it has business relations with other related parties, including the family members of two directors, but did not specify what these relations were.

93.     Demand on the ABFI Board of Directors to institute this action is not necessary because such a demand would be a futile and useless act, particularly for the additional following reasons:

  a.     A majority of the directors of ABFI, as detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred

and participated in efforts to conceal or disguise those wrongs from ABFI stockholders and investors and are, therefore, not disinterested parties and many are the principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

b. The Defendant Directors, including Santilli, DeLuca, Sussman and Becker own a majority of the common stock of the Company and control its direction and the composition of its Board of Directors.  Defendant Santilli owns 40% of the Company's common stock and effectively controls and directs the Company himself, including the composition of the Company's Board of Directors.   The Board is dominated by Santilli.   Santilli's dominance over the Board and the control and direction of the Company is evidenced by, among other things, his placement of numerous family members in high-paying positions with the Company.

c. A majority of the Directors had a responsibility and obligation to assure that all press releases and filings of SEC reports, including all financial reports, were accurate and that all financial controls and other oversight procedures were in place that would have detected and prevented the false and misleading statements put out by the Company to the public that are further described in this Complaint;

d. In order to bring this suit, a majority of the directors of ABFI would be forced to sue themselves and/or persons with whom they have extensive

business and personal entanglements, which they will not do, thereby excusing demand;

e.     The acts complained of constitute violations of state law and the fiduciary duties owed by ABFI officers and directors and are incapable of ratification;

f.     The actions of the Directors has impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiff's demands;

g.     Defendant Santilli is currently a defendant in numerous securities class action lawsuits arising out of the wrongdoing alleged herein and a suit by the Defendant Directors of ABFI to remedy the wrongs alleged herein would likely expose the Director Defendants and ABFI to further violations of securities laws which would result in additional civil actions being filed against one or more of the Director Defendants; thus they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves;

h.     ABFI has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein; yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct which caused the filing of securities class actions against ABFI, nor have they attempted to recover any part of the damages ABFI suffered and will suffer thereby or the illegal insider trading proceeds reaped by Defendant Kaufman;

i.      If the Defendant Directors were to bring this derivative action against themselves, they would thereby expose their own negligence and misconduct which underlies allegations against the Company contained in the class action complaints for violations of federal securities law. Such admissions would impair the Company's and their defense of the Class Actions and greatly increase the probability of their personal liability in the Class Actions in an amount likely to be in excess of any insurance coverage available to the Director Defendants;

j.      The Director Defendants are believed to be covered by an insurance policy which covers the type of misconduct alleged herein, which policy would likely preclude coverage, if any, if the Director Defendants initiated action against any of the other Director Defendants named herein. Therefore, the ABFI Board, or any committee thereof, is effectively disabled from complying with any demand that would cause the Company to bring suit against the Defendants because to do so would result in the loss of their insurance coverage.

94.    Plaintiff has not made any demand on the shareholders of ABFI to institute this action since such demand would be a futile and useless act for the following reasons:

a.      ABFI is a publicly traded company with thousands of shareholders;

b.      Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or telephone numbers of shareholders; and

c.     Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could even be individually identified.

95.    Plaintiff will adequately and fairly represent the interests of ABFI in enforcing and prosecuting its rights.

## CAUSES OF ACTION

### Count I
### Against Defendants for Breach of Fiduciary Duty

96.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

97.    The Defendants owed and owe ABFI fiduciary obligations.  By reason of their fiduciary relationships, the Defendants owed and owe ABFI the highest obligation of good faith, fair dealing, loyalty and due care.

98.    The Defendants breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

99.    Each of the Defendants had actual or constructive knowledge that they had caused ABFI to improperly misrepresent the financial results of the Company and failed to correct publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment.

100.   As a direct and proximate result of the Defendants' misconduct, ABFI has suffered and will continue to suffer significant damages.  As a result of the misconduct alleged herein, the Defendants are liable to the Company

101.   Plaintiff, on behalf of ABFI, has no adequate remedy at law.

**Count II**
**Against Defendants for Abuse of Control**

102.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as if though fully set forth herein.

103.    The Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence ABFI, for which they are legally responsible.

104.    As a direct and proximate result of the Defendants' abuse of control, ABFI has sustained significant damages, and Defendants are liable to the Company

**Count III**
**Against Defendants for Gross Mismanagement**

105.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as if though fully set forth herein.

106.    By their actions alleged herein, the Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of ABFI in a manner consistent with the operations of a publicly held corporation.

107.    As a direct and proximate result of the Individual Defendants' gross mismanagement, ABFI has sustained significant damages, and Individual Defendants are liable to the Company.

**Count IV**
**Against Defendant Kaufman for Breach of Fiduciary Duties for**
**Insider Selling**

108.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as if though fully set forth herein.

109.   Defendant Kaufman sold large portions of ABFI stock.  For example, on May 22, 2003, seven (7) days after the U.S. Attorney's had commenced an investigation into the Company, but prior to the Company's public disclosure of that investigation, Kaufman sold 25,000 shares of ABFI stock for proceeds of approximately $252,500.  Additionally, on April 1, 2003, Kaufman sold 9,500 shares of ABFI stock for proceeds of approximately $104,500.  On March 18, 2003, Kaufman sold 20,500 shares of ABFI stock for proceeds of approximately $246,820.  On November 22, 2002, Kaufman sold 40,944 shares of ABFI stock for proceeds of approximately $471,856.  On February 4, 2002, Kaufman sold 17,000 shares of ABFI stock for proceeds of approximately $248,030.  On January 28, 2002, Kaufman sold 18,176 shares of ABFI stock for proceeds of approximately $248,030.  On December 12, 2001, Kaufman sold 18,100 shares of ABFI stock for proceeds of approximately $333,764.  Finally, on November 30, 2001, Kaufman sold 44,500 shares of ABFI stock for proceeds of approximately $889,555.

110.   At the time of the stock sales set forth herein, Kaufman knew the information described above, and sold ABFI common stock on the basis of such information.

111.   At the time of the stock sales, Kaufman knew that the Company's revenues were materially overstated.

112.   The Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.      Against all of the Defendants for the damages sustained by ABFI as a result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.      Equitable and/or injunctive relief as permitted by law;

C.      Restitution and disgorgement of profits;

D.      Attorneys fees and Costs

E.      Any such other and further relief as may be just and proper.

Plaintiff demands a trial by jury.

Dated: March ____, 2004

                                        Respectfully submitted,


                                        _____
                                        Brian M. Felgoise
                                        LAW OFFICES OF BRIAN M. FELGOISE
                                        261 Old York Road, Ste.  423
                                        Jenkintown, PA  19046
                                        Tel: (215) 886-1900
                                        Fax: (215) 886-1909

                                        and

                                        William B. Federman
                                        FEDERMAN & SHERWOOD
                                        120 N. Robinson Avenue, Suite 2720
                                        Oklahoma City, OK 73102
                                        Tel: (405) 235-1560
                                        Fax: (405) 239-2112